1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ARTHUR CARR,

11               Plaintiff,               No. 2:09-cv-0826 GEB KJN P

12          vs.

13   H. HER, and A.V. Solorzano,          ORDER AND

14               Defendants.              FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17               Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to

18   42 U.S.C. § 1983.  Defendants' motion for summary judgment and to strike are now before the

19   court.  This case is proceeding on plaintiff's verified,[1] third amended complaint, filed August 30,

20   2010, against defendants Her and Solorzano.  Plaintiff alleges that defendants (1) used excessive

21   force on, and failed to protect, plaintiff, in violation of the Eighth Amendment; (2) violated

22   plaintiff's due process rights; (3) intentionally inflicted emotional distress in violation of

23   California state law; and (4) allegedly falsified incident reports.  Plaintiff argues that as a result,

24   _____

25        [1]  The third amended complaint is signed under the penalty of perjury and so may be
     deemed an affidavit for purposes of summary judgment.  Moran v. Selig, 447 F.3d 748, 760 n.16
26   (9th Cir. 2006).

                                              1

1  plaintiff sustained (1) a two large cuts to his back, requiring hundreds of stitches, causing pain

2  and suffering; (2) excessive administration of pepper spray; and (3) serious emotional distress.

3  As explained more fully below, the court recommends that defendants' motion for summary

4  judgment be granted in part, and denied in part; defendants' motion to strike is denied.

5  II.  Motion for Summary Judgment

6          Defendants move for summary judgment on the grounds that:  (1) defendants did

7  not use excessive force and had no intention to harm plaintiff; (2) defendants did not show

8  deliberate indifference in their protection of plaintiff; (3) defendants did not violate plaintiff's

9  due process rights; (4) defendants did not engage in outrageous conduct or intentionally inflict

10  emotional distress; (5) plaintiff fails to state a claim as to the alleged false statements in the

11  incident reports; and (6) defendants are entitled to qualified immunity.

12          A.  Legal Standard for Summary Judgment

13          Summary judgment is appropriate when it is demonstrated that the standard set

14  forth in Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if

15  the movant shows that there is no genuine dispute as to any material fact and the movant is

16  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[2]

17          Under summary judgment practice, the moving party always bears
           the initial responsibility of informing the district court of the basis
18         for its motion, and identifying those portions of "the pleadings,
           depositions, answers to interrogatories, and admissions on file,
19         together with the affidavits, if any," which it believes demonstrate
           the absence of a genuine issue of material fact.
20

21  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

22  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

23  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

24

25          [2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
    2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule
26  56, "[t]he standard for granting summary judgment remains unchanged."

1   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

2   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

3   committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

4   burden of production may rely on a showing that a party who does have the trial burden cannot

5   produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

6   should be entered, after adequate time for discovery and upon motion, against a party who fails to

7   make a showing sufficient to establish the existence of an element essential to that party's case,

8   and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

9   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

10  necessarily renders all other facts immaterial."  Id. at 323.

11          Consequently, if the moving party meets its initial responsibility, the burden then

12  shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

13  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

14  to establish the existence of such a factual dispute, the opposing party may not rely upon the

15  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

16  form of affidavits, and/or admissible discovery material in support of its contention that such a

17  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

18  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

19  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

20  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

21  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

22  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

23  1436 (9th Cir. 1987).

24          In the endeavor to establish the existence of a factual dispute, the opposing party

25  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

26  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

3

1    versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 630.  Thus, the "purpose of summary

2    judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

3    genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

4    committee's note on 1963 amendments).

5        In resolving a summary judgment motion, the court examines the pleadings,

6    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

7    any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  <u>See</u> <u>Anderson</u>,

8    477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

9    court must be drawn in favor of the opposing party.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587.

10   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

11   produce a factual predicate from which the inference may be drawn.  <u>See</u> <u>Richards v. Nielsen</u>

12   <u>Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir.

13   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

14   show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

15   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

16   'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 586 (citation omitted).

17        By order filed April 24, 2009, the court advised plaintiff of the requirements for

18   opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt.

19   No. 9); <u>see</u> <u>Rand v. Rowland</u>, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); <u>Klingele v.</u>

20   <u>Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988).

21        B.  <u>Civil Rights Claims Standards</u>

22        The Civil Rights Act under which this action was filed provides as follows:
         Every person who, under color of [state law] . . . subjects, or causes

23        to be subjected, any citizen of the United States . . . to the
         deprivation of any rights, privileges, or immunities secured by the

24        Constitution . . . shall be liable to the party injured in an action at
         law, suit in equity, or other proper proceeding for redress.

25

26   42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

1    actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

2    Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978) ("Congress did not intend

3    § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976)

4    (no affirmative link between the incidents of police misconduct and the adoption of any plan or

5    policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects'

6    another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an

7    affirmative act, participates in another's affirmative acts or omits to perform an act which he is

8    legally required to do that causes the deprivation of which complaint is made."  Johnson v.

9    Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

10   III.  Facts

11           For purposes of the instant motion for summary judgment, the court finds the

12   following facts undisputed, except as otherwise noted.

13           1.  Plaintiff is a state prisoner incarcerated at North Kern State Prison.

14           2.  The incidents at issue here took place on March 10, 2008, while plaintiff was

15   incarcerated at the California State Prison-Solano ("CSP-Solano").

16           3.  Defendant H. Her was employed by the California Department of Corrections

17   ("CDCR"), and held the position of Correctional Officer at CSP-Solano.  On March 10, 2008,

18   defendant Her was assigned to Building 8, as the second tier officer.

19           4.  Defendant A.V. Solorzano was employed by the CDCR, and held the position

20   of Correctional Officer at CSP-Solano.  On March 10, 2008, defendant Solorzano was working

21   in Building 8, as the floor officer.

22           5.  Defendant Solorzano was plaintiff's immediate supervisor.

23           6.  At about 2:00 p.m., plaintiff was released to the Building 8 day room to begin

24   his job as a p.m. porter.

25           7.  Upon being released to the day room, plaintiff immediately acquired two large

26   plastic bags and began emptying trash cans in Building 8.

8.   While continuing his porter duties on the second tier, plaintiff passed the cell door of inmate Jerry Sprague, and plaintiff jokingly yelled down to a group of inmates walking out of the building for yard activities.

9.   Inmate Sprague was locked inside his cell, waiting for program release, and while standing at the cell door, asked plaintiff if plaintiff was talking to Sprague, and was plaintiff disrespecting him?  Plaintiff said he was not disrespecting Sprague and walked away.

10.   When plaintiff went downstairs, he asked inmate Terrell Woodard to walk with him to the "white" side of the day room and watch plaintiff's back while plaintiff continued picking up trash.

11.   As plaintiff and inmate Woodard approached the trash can on the far side of the stairway, inmate Sprague stepped away from a crowd of white inmates.  As Sprague walked toward plaintiff, Sprague said that plaintiff had called Sprague a "punk," and then Sprague began fist hitting plaintiff in the head.[3]

12.   At approximately 2:25 p.m., defendant Solorzano heard "a noise coming from the direction of cell 119."  (Dkt. No. 117-1 at 82 (Rules Violation Report).)

13.   At approximately 2:25 p.m., Correctional Officer Ariola, working as a control booth officer, heard yelling on the day room floor near cell 120, and saw two white inmates throwing what appeared to be punches at a black inmate.   (Dkt. No. 110-5 at 1.)

14.   Upon hearing the noise, defendant Solorzano looked toward the noise and observed two inmates fighting.[4]

15.   Defendant Solorzano yelled at the inmates to get down, several times, and he alerted his partner, defendant Her.

---

[3]  As explained more fully below, defendants Solorzano and Her contend it was mutual combat between plaintiff and Sprague.

[4]  Plaintiff disputes this fact; plaintiff contends he was not fighting, but that inmate Sprague was hitting plaintiff.  (Dkt. No. 119 at 2.)

16.  Defendant Her looked toward the commotion near cell 119, and saw two inmates fighting.[5]

17.  Defendant Her radioed Solano Control for a "Code One" response and then activated his personal alarm.

18.  Upon seeing the fight, Control Booth Officer Ariola activated his personal alarm and proceeded to grab the 40 mm which was racked.  (Dkt. No. 110-5 at 2.)

19.  Many of the details concerning what took place next are disputed:

A.  Defendant Solorzano contends the incident was a mutual fight between inmate Sprague and plaintiff because he saw them fighting with closed fist punches; plaintiff contends inmates Sprague and Carroll attacked plaintiff, and plaintiff did not engage in the fight because he was knocked to the ground by Sprague's initial punches.  Control Booth Officer Ariola saw two white inmates, later identified as Sprague and Carroll, throwing what appeared to be punches at a black inmate, later identified as plaintiff.  (Dkt. No. 110-5 at 1.)

B.  Plaintiff contends that he was pepper-sprayed by defendant Her while plaintiff was prone on the ground.  Defendant Her contends plaintiff went to the ground after defendant Her pepper-sprayed plaintiff and Sprague.  (Dkt. No. 110-4 at 1.)  Defendant Solorzano declares plaintiff and Sprague refused to comply with defendant Her's order to get down, but that plaintiff got down after defendant Her used pepper spray.  (Dkt. No. 110-6 at 2.) Defendant Solorzano claims he did not pepper spray plaintiff.  Plaintiff claims that although he could not see due to defendant Her's application of pepper spray, he could hear defendant Solorzano's voice "directly over [plaintiff's] head, and . . . was showered with large volumes of pepper spray even though [plaintiff] was laying prone out on the floor."  (Dkt. No. 117-1 at 4.) At that point, plaintiff "began experiencing enormous pain in his back and from the pepper spray

_____

[5]  Plaintiff also disputes this fact, taking the position that plaintiff was not fighting, but that inmate Sprague was hitting plaintiff.  (Dkt. No. 119 at 3.)  Plaintiff also disputes the timing of the "get down" yell and the using of the radio as it relates to plaintiff's position during the incident, i.e. while plaintiff was falling or was already down on the ground.  (Dkt. No. 119 at 3.)

1   in his eyes and back, creating an acute burning sensation." (Id. at 5.)

2          C.  It is undisputed that inmate Michael Soares witnessed plaintiff being

3   hit and knocked down by inmate Sprague, while inmate Soares was in a sitting position on the

4   floor, following the guards' command for all inmates to get down.  At a preliminary hearing,[6]

5   inmate Soares testified that plaintiff fell to the ground after two punches by inmate Sprague,

6   inmate Woodard attempted to pull Sprague off plaintiff, inmate Carroll jumped in and made

7   slicing motions cutting Woodard's arm, Woodard ran off, and inmate Carroll then went toward

8   plaintiff and made slicing motions on plaintiff's back while plaintiff was on the ground.  (RT 6-

9   9.)  Inmate Soares further testified that after Carroll made slicing movements as to plaintiff,

10  while plaintiff was on the ground, then defendant Solorzano came running with the pepper spray,

11  sprayed "the inmates," and "they stopped fighting."  (RT at 9.)  However, inmate Soares did not

12  mention defendant Her in Soares' testimony.  (RT 2-34.)

13         D.  Plaintiff contends inmate Carroll cut plaintiff "in plain view" of

14  defendant Solorzano while defendant Solorzano "was spraying plaintiff and Woodard as plaintiff

15  lay on the floor under the stairwell."  (Dkt. No. 119 at 6.)  However, in his deposition, plaintiff

16  concedes that due to the pepper spray he did not see, and did not know, when inmate Carroll

17  slashed plaintiff.  (Pl.'s Depo. 48, 70.)  Defendant Her declares that "[i]mmediately after [he]

18  saw Woodard strike Sprague, [he] observed . . . [Carroll] come from underneath the stairwell

19  near cell 118 and appeared to be striking [plaintiff] from behind."  (Dkt. No. 110-4 at 2.)

20  Defendant Solorzano declares he saw inmate Carroll behind plaintiff, but "could not make out

21  his motions."  (Dkt. No. 110-6 at 2.)

22         E.  After Control Booth Officer Ariola grabbed the 40 mm weapon, he

23

24         [6]  On January 26, 2009, a preliminary hearing was held in People v. Carroll and Sprague,
     Case No. FCR256079 and FCR 256080 (Solano County Superior Court), for criminal charges
25   brought against inmates Carroll and Sprague for their roles in the March 10, 2008 incident at
     issue herein.  The January 26, 2009 Reporter's Transcript of Preliminary Hearing was lodged on
26   June 6, 2011, and references to "RT" are to that transcript.

turned and saw defendant Solorzano spray pepper spray to the facial area of inmates Sprague and

Woodward.  (Dkt. No. 110-5 at 2.)  Officer Ariola then saw defendant Solorzano proceed toward

inmate Carroll who went to a prone position once defendant Solorzano used pepper spray on

him.  (Dkt. No. 110-5 at 2.)  Officer Ariola's declaration does not mention defendant Her.  (Dkt.

No. 110-5, *passim*.)

            F.  Inmate Terrell Woodard declares he witnessed plaintiff "get attacked

by two aggressive white inmates with a weapon."  (Dkt. No. 117-1 at 20.)  Inmate Woodard

declares:

> I also witness[ed] plaintiff being stab[bed] numerous of time[s] by
> the white inmate[;] I attempted to warrant off the aggressive inmate
> [well,] he turn[ed] his anger towards me and I was wounded in my
> attempt.
>
> 6.  I also witness officer Solorzano [sic] who slip[ped] and fell on
> his way to stop the fight.  When C/O Solorzano [sic] got there,
> instead of spraying the aggressive white inmate who had the
> weapon, he spray[ed] me the victim, and that cause[d] the
> aggressive white inmate to do more damages.

(Dkt. No. 117-1 at 21.)  Woodard's declaration also does not reference defendant Her.  (Id.)

            G.  Inmate Joel Holly declares that on March 10, 2008, he witnessed

plaintiff "suffer an attack by two White inmates, named "Pirate" [Sprague][7] and "J.C." [Carroll],

also known to be "Skinheads."  (Dkt. No. 115 at 6.)  Holly declares that at approximately 2:25

p.m., he saw inmate Sprague punch plaintiff twice in the facial area, and plaintiff stumbled back

and fell on the ground under the stairway near cell 118.  (Dkt. No. 115 at 6.)  After plaintiff was

knocked down, Holly saw Sprague hit and kick plaintiff.  Woodard, standing nearby, attempted

to pull Sprague off.  Meanwhile, Holly saw inmate Carroll stand up, go behind the stairway, and

walk up to Woodard, and began making striking motions at him.  Holly saw defendant Her "walk

up and spray[] all the inmates."  (Id.)  Holly then saw Woodard "jerking on [Sprague's] shirt

---

[7] "Pirate" was identified as Sprague at the preliminary hearing.  (RT 5.)  Carroll's first
name is "John," thus the nickname, "J.C."

while [Carroll] kept swinging at Woodard."  (Id.)  "By then[,] [defendant] Solorzano was approaching and then he slipped and fell.  He got up and began spraying only Woodard who was still pulling at [Sprague], and [plaintiff] who was laying flat out on the floor."  (Id.)  Holly "next saw [Carroll] hit Woodard again causing Woodard to run and then [Carroll] got down on his knees over [plaintiff] and began to strike at [plaintiff's] back in a manner of cutting him."  (Dkt. No. 115 at 6-7.)  Holly declares that defendant Solorzano "did not once turn the spray on [Carroll] while [Carroll] was down on his knees cutting [plaintiff], and [defendant] Her had walked to the other side of the stairway alone while looking at [Carroll] cutting [plaintiff] and it was plain to see that both [plaintiff] and Woodard [were] bleeding severely."  (Dkt. No. 115 at 7.)  Holly "next looked up to the tower to see if C/O Ariola was going to shoot his block gun or do something.  When [Holly] spotted [Ariola] he was near the control booth without a weapon in his hand even though the alarm system had been initiated well within a one minute period after [plaintiff] had been knocked down."  (Id.)  Holly "next saw [Carroll] running and [defendant] Solorzano chasing him towards cells 111 and 110."  (Id.)

> H.    Plaintiff also provided the declaration of inmate Green, who declares he witnessed the March 10, 2008 incident.  Inmate Green saw defendants pepper spraying plaintiff instead of the inmate with the weapon. (Dkt. No. 117-1 at 15-16.)

> 25.  After the altercation, Carroll ran from the scene and made a pitching motion toward a cell as he was running.  Defendant Solorzano chased Carroll and, after applying pepper spray, Carroll went to the ground.

> 26.  Once responding staff arrived, and all inmates were in custody or control, defendant Solorzano went outside to flush his eyes from the pepper spray, and defendant Her searched the area near cell 114 finding a razor with what appeared to be blood on the blade.  Defendant Solorzano did not leave inmate Carroll alone until a correctional officer Letourneau arrived, and took custody of Carroll.

> 27.  At the time of the fight, there were nearly eight to twelve white inmates in the

1  area.[8]

2         28.  Plaintiff received two long slashing type injuries to his back requiring

3  stitches.  At the preliminary hearing, Dr. Traquina testified as to the nature of plaintiff's injuries.

4  (RT 39-42.)  Plaintiff sustained two severe lacerations in an "L" shape.  (RT 39.)  Starting at the

5  top of the left shoulder blade, there was one 12" laceration going vertically down to plaintiff's

6  right flank, and then another 12" laceration going horizontally from flank to flank.  (RT 39.)  The

7  horizontal laceration was very deep, down to the bone, and the laceration cut both loin muscles

8  on either side.  (RT 39.)  The lacerations were caused by a sharp object, and the deepest point on

9  the horizontal laceration was seven to eight centimeters, with Dr. Traquina estimating that seven

10  centimeters was close to three inches deep.  (RT 42.)  It was "very difficult" to repair, requiring

11  "many, many" sutures.  (RT 40.)

12         29.  It is undisputed that plaintiff did not tell defendants Her or Solorzano, or any

13  other correctional officer, that plaintiff exchanged words with inmate Sprague prior to the

14  altercation.  (Pl.'s Depo. at 100.)

15  IV.  Eighth Amendment Claims:  Excessive Force and Failure to Protect

16         A.  Legal Standards

17         The Eighth Amendment prohibits the infliction of "cruel and unusual

18  punishments."  U.S. Const. amend. VIII.  The "unnecessary and wanton infliction of pain"

19  constitutes cruel and unusual punishment prohibited by the United States Constitution.  Whitley

20  v. Albers, 475 U.S. 312, 319 (1986).  Neither accident nor negligence constitutes cruel and

21  unusual punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good faith,

22  that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."

23  _____

24  [8]  In defendants' memorandum of points and authorities, defendants articulate this fact as:
"The day room was full of eight to twelve additional inmates who were moving toward the fight
when defendants were responding."  (Dkt. No. 110-1 at 3.)  However, the qualifier "who were

25  moving toward the fight when defendants were responding" was not included in either
defendants' or plaintiff's statements of undisputed facts, and plaintiff did not object to

26  defendants' statement that did not contain this qualifying language.

Whitley, 475 U.S. at 319.

What is needed to show unnecessary and wanton infliction of pain "varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (citing Whitley, 475 U.S. at 320). To prevail on an Eighth Amendment claim the plaintiff must show that objectively he suffered a "sufficiently serious" deprivation. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Wilson v. Seiter, 501 U.S. 294, 298-99 (1991). The plaintiff must also show that subjectively each defendant had a culpable state of mind in allowing or causing the plaintiff's deprivation to occur. Farmer, 511 U.S. at 834.

It is well established that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley, i.e., whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." McMillian, 503 U.S. at 6-7. A prisoner is not required to show a "significant injury" to establish that he suffered a sufficiently serious constitutional deprivation. McMillian, 503 U.S. at 9-10.

Factors such as the need for the application of force, the relationship between the need and amount of force that was used, and the extent of injury inflicted are relevant to the ultimate determination as to whether force used by prison personnel was excessive. From these factors, inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur. "Equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them, and any efforts made to temper the severity of a forceful response." Whitley, 475 U.S. at 321.

It is also well established that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offense

12

1   against society.'" Id. at 834.  Prison officials do not, however, incur constitutional liability for

2   every injury suffered by a prisoner at the hands of another prisoner.  Id.  A prison official violates

3   the Eighth Amendment "only if he knows that inmates face a substantial risk of serious harm and

4   disregards that risk by failing to take reasonable measures to abate it." Id. at 847.

5           Analysis

6           The court finds that defendants Her and Solorzano are not entitled to summary

7   judgment on plaintiff's claims that they used excessive force because they have not met their

8   initial burden of demonstrating the absence of a genuine issue of material fact.  See, e.g.,

9   McMillian, 503 U.S. at 7 (serious injury not required to demonstrate use of excessive force).

10  Plaintiff claims he was knocked to the ground by Sprague prior to the arrival of either defendant

11  at the scene, and remained on the ground until removed from the scene by ambulance.  Plaintiff

12  claims both defendants pepper-sprayed plaintiff while he was prone on the ground, and that he

13  was subjected to "copious amounts" of pepper spray.  (Dkt. No. 117-1 at 8.)  Plaintiff also claims

14  that defendant Solorzano pepper-sprayed plaintiff and Woodard, both black, but failed to pepper-

15  spray inmate Carroll, who is white.  To defeat plaintiff's claims, defense counsel has submitted

16  declarations by defendants in which both defendants claim plaintiff did not get down until after

17  defendant Her pepper-sprayed plaintiff.  Defendant Solorzano declares he did not pepper-spray

18  plaintiff at all, and that defendant Solorzano pepper-sprayed Carroll twice; once when Carroll

19  was fighting with Woodard and plaintiff, and again when Solorzano was pursuing Carroll after

20  Carroll left the scene.

21          However, taking plaintiff's allegations as true, if the jury finds plaintiff was

22  compliant, laying prone on the ground at the time either defendant used pepper spray on plaintiff,

23  plaintiff's compliance would demonstrate that he did not pose a threat to the safety of defendants

24  or others.  Vlasich v. Reynoso, 117 F. Appx. 568, 569 (9th Cir. 2004) (finding "a reasonable

25  inference of wanton infliction of pain in violation of the Eighth Amendment" at the motion to

26  dismiss phase where officers still administered pepper spray after compliance rather than

13

administering pepper spray in order to gain compliance).  If the jury finds plaintiff was prone on the ground and compliant, the use of pepper spray and the excessive use of pepper spray in such circumstances was unnecessary and wanton, and would violate plaintiff's constitutional right to be free from excessive force.  Compare Clement v. Gomez, 298 F.3d 898, 903-04 (9th Cir. 2002) (the good faith use of a small amount of pepper spray to quell a fight was not excessive force, even if bystanders were exposed),[9] and Vlasich, 117 F.Appx. at 568.  Excessive force directed at one prisoner can also establish a cause of action for harm that befalls other prisoners.  See Robins v. Meecham, 60 F.3d 1436, 1441-42 (9th Cir. 1995) (specific intent to injure specific inmate not required).  Here, plaintiff alleges defendants pepper-sprayed the black inmates, plaintiff and Woodard, yet failed to pepper-spray the white inmate, Carroll, who was attacking plaintiff.  This allegation, taken as true, raises an inference of malicious or sadistic intent.  See Whitley, 475 U.S. at 321 ("inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.")  Thus, defendants' motion for summary judgment on plaintiff's excessive force claims should be denied.

Similarly, defendants Her and Solorzano are not entitled to summary judgment on plaintiff's failure to protect claims because they have not met their initial burden of demonstrating the absence of a genuine issue of material fact.  See, e.g., Robins, 60 F.3d at 1442 ("a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene.").  Plaintiff claims that defendants failed to protect him from inmate Carroll by:  (1) defendant Her's

---

[9]  While the court in Clement granted defendants qualified immunity based on their use of pepper spray in a good faith effort to restore discipline, the plaintiff in Clement was not alleging he was laying prone on the ground at the time he was pepper-sprayed.  Id.  Rather, in Clement, two inmates were brutally fighting and failed to respond to officers' orders to stop and get down, and it appears those facts were undisputed.  Id.  The court in Clement also held that evidence that a prison official administered a second pepper spray after coughing and gagging was heard from the cell "does not lead to the inference that the official used the pepper spray 'maliciously and sadistically for the very purpose of causing harm.'"  Clement, 298 F.3d at 903-04, quoting Whitley, 475 U.S. at 320-21.  As noted above, the instant case is distinguishable on its facts.

failure to attempt to subdue Carroll, allowing Carroll to slash Woodard and then plaintiff; (2) defendant Her leaving plaintiff debilitated by pepper spray, prone on the ground, and vulnerable to the subsequent razor attack by Carroll; (3) defendant Her's failure to intervene when defendant Solorzano pepper-sprayed plaintiff while plaintiff was being assaulted by Sprague and Carroll; and (4) defendant Solorzano's failure to pepper-spray Carroll while Carroll was attacking plaintiff.  Plaintiff has provided inmate declarations supporting these allegations.  To defeat plaintiff's claims, defense counsel has submitted declarations by defendants in which they declare that plaintiff was injured prior to their arrival at the scene, so they could not protect plaintiff from inmate Carroll's attack.  Although defendants may ultimately prevail on this version of the facts at trial, whether defendants failed to protect plaintiff remains a factual dispute at this time.

Defendants argue that inmate Soares' testimony at the preliminary hearing is consistent with the declarations of Solorzano, Her, and Ariola.  However, plaintiff has provided contrary declarations.  Moreover, defendants fail to address the absence of any reference to defendant Her by either Soares or Ariola.  Because it is undisputed that Her was the first officer on the scene, the failure of these eyewitnesses to mention defendant Her raises an inference that these witnesses did not see defendant Her, which a reasonable jury might find supports plaintiff's view that defendant Her walked away, leaving plaintiff at substantial risk of harm.

On defendants' motion for summary judgment, the court is required to believe plaintiff's evidence and draw all reasonable inferences from the facts before the court in plaintiff's favor.  Accordingly, the court rejects defense counsel's argument because it relies on defendants' contested view of the material facts.

Therefore, because there are material disputes of fact remaining as to whether defendants Her and Solorzano used excessive force or failed to protect plaintiff under the circumstances, defendants' motion for summary judgment on plaintiff's Eighth Amendment claims should be denied.

V.  Due Process Claim

Plaintiff alleges that the same facts that give rise to Eighth Amendment violations also give rise to a due process violation.  Plaintiff is mistaken.  Plaintiff retains no separate due process remedy for violations of the Eighth Amendment.  See Toussaint v. McCarthy, 801 F.2d 1080, 1093 (9th Cir. 1986) ("[A]cceptance of such an argument would create an unworkable standard"; thus, "the presence of eighth amendment violations . . . do[] not create a liberty interest."), abrogated in part on other grounds by Sandin, 515 U.S. 472.

> [T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.  After conviction, the Eighth Amendment "serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified."  Any protection that "substantive due process" affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment.

Graham v. Connor, 490 U.S. 386, 395, n.10 (1989), (quoting Whitley, 475 U.S. at 327); Esplanade Properties, LLC v. City of Seattle, 307 F.3d 978, 982 & n.6 (9th Cir. 2002), cert. denied, 539 U.S. 926 (2003) (Claims of excessive force brought pursuant to § 1983 "must be analyzed under the explicit textual sources of constitutional protection found in the Fourth and Eighth Amendments, rather than under the 'more subjective standard of substantive due process.'") (internal citations omitted).  In other words, plaintiff's constitutional rights in the context of an alleged Eighth Amendment violation are adequately protected under the Eighth Amendment, and must be pursued under the Eighth Amendment rather than as a due process claim under the Fourteenth Amendment.  Accordingly, defendants are entitled to summary judgment on this claim.

VI.  State Law Claims

A.  Infliction of Emotional Distress

Plaintiff's third amended complaint alleges negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED") claims against

16

1  defendants by which plaintiff seeks recovery for mental suffering.

2       The elements of an IIED claim are:  (1) defendant's outrageous conduct; (2)

3  defendant's intention to cause, or reckless disregard of the probability of causing, emotional

4  distress; (3) plaintiff's suffering severe or extreme emotional distress; and (4) an actual and

5  proximate causal link between the tortious (outrageous) conduct and the emotional distress.

6  Nally v. Grace Community Church of the Valley, 47 Cal.3d 278, 300, 253 Cal. Rptr. 97, 110

7  (1988), cert. denied, 490 U.S. 1007 (1989); Cole v. Fair Oaks Fire Protection Dist., 43 Cal.3d

8  148,155, n.7, 43 Cal.3d 148 (1987).[10]  To be outrageous, the conduct "must be so extreme as to

9  exceed all bounds of that usually tolerated in a civilized community."  Davidson v. City of

10  Westminister, 32 Cal.3d 197, 209, 185 Cal. Rptr. 252 (1982) (internal quotation omitted).

11  Conduct is extreme and outrageous when it is of a nature that is especially calculated to cause,

12  and does cause, mental distress.  Liability does not extend to mere insults, indignities, threats,

13  annoyances, petty oppressions, or other trivialities.  Fisher v. San Pedro Peninsula Hosp., 214

14  Cal. App.3d 590, 617, 262 Cal. Rptr. 842, 857 (1989).

15       To support an IIED claim, the conduct must be more than "intentional and

16  outrageous.  It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of

17  whom the defendant is aware."  Christensen v. Superior Court, 54 Cal.3d 868, 903, 2 Cal.

18  Rptr.2d 79 (1991).  The California Supreme Court has further explained:

19  > "The law limits claims of intentional infliction of emotional
20  > distress to egregious conduct toward plaintiff proximately caused
   > by defendant." . . .  The only exception to this rule is that
   > recognized when the defendant is aware, but acts with reckless
21  > disregard, of the plaintiff and the probability that his or her conduct
   > will cause severe emotional distress to that plaintiff. . . .  Where
22  > reckless disregard of the plaintiff's interests is the theory of

23

24  _____

[10]  Other California courts have identified the elements as "(1) extreme and outrageous
conduct by the defendant with the intention of causing, or reckless disregard of the probability of
25  causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and
(3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous
26  conduct." Cochran v. Cochran, 65 Cal. App.4th 488, 494, 76 Cal. Rptr.2d 540 (1998) (citing
KOVR-TV, Inc. v. Superior Court, 31 Cal. App.4th 1023, 1028, 37 Cal. Rptr.2d 431 (1995)).

recovery, the presence of the plaintiff at the time the outrageous conduct occurs is recognized as the element establishing a higher degree of culpability which, in turn, justifies recovery of greater damages by a broader group of plaintiffs than allowed on a negligent infliction of emotional distress theory. . . .

Christensen, 54 Cal.3d at 905-06 (citations omitted.)

"Whether a defendant's conduct can reasonably be found to be outrageous is a question of law that must initially be determined by the court; if reasonable persons may differ, it is for the jury to determine whether the conduct was, in fact, outrageous." Berkley v. Dowds, 152 Cal. App.4th 518, 534, 61 Cal. Rptr.3d 304 (2007). There is no bright line standard for judging outrageous conduct, and a case-by-case appraisal of conduct is required. Cochran, 65 Cal. App.4th at 494.

NIED is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply. Huggins v. Longs Drug Stores California, Inc., 6 Cal.4th 124, 129, 24 Cal. Rptr.2d 587 (1993). California law recognizes that "there is no independent tort of negligent infliction of emotional distress" in that "[t]he tort is negligence, a cause of action in which a duty to the plaintiff is an essential element." Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 984, 25 Cal. Rptr.2d 550 (1993). The existence of a duty is a question of law. Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc., 48 Cal.3d 583, 588, 257 Cal. Rptr. 98 (1989).

Defendants argue that their conduct was not outrageous; that defendants were responding to a mutual fight among four inmates and defendants' intention was to quell the fight before the additional inmates on the floor became involved. However, defendants argue this claim based on their own view of the facts. Taking plaintiff's allegations as true, reasonable minds could differ on whether a correctional officer's conduct could be viewed as "outrageous" if the officer walked away from a black inmate laying on the ground, with eight to twelve white inmates in close proximity, in the midst of a fight between two white and two black inmates. Reasonable minds could also differ on whether pepper spraying only the black participants in a

fight, or pepper spraying an inmate lying prone on the ground, could be viewed as outrageous.

While a reasonable jury may conclude it was the conduct of inmate Carroll that caused plaintiff's

serious emotional distress, plaintiff contends that it was defendants' failure to protect him from

inmate Carroll and using excessive force that caused plaintiff serious emotional distress.  It is not

surprising that an inmate suffering the acts plaintiff alleges would become seriously afraid that

similar acts might occur again.  While it is clear that inmate Carroll's acts were outrageous,

whether or not the conduct of defendants can be construed as outrageous is a question for the

jury, based upon the disputed issues of fact set forth above.

B.  <u>Allegedly Falsified Incident Reports</u>

In the third amended complaint, plaintiff alleges:

defendants violated state law with respect to filing false incident
reports when:

a) filing incident report[s] at the administrative level lied about
how plaintiff was injured, in order to conceal their acts or failures
to act;

b) knowingly and intentionally stating lies in the report and knew it
to be false, violating Civil Code Section 3294.

(Dkt. No. 69 at 17.)

Defendants contend that plaintiff's allegations are conclusory because plaintiff

fails to set forth specific allegations he claims are false, and plaintiff has alleged no damages or

harm as a result of the alleged false statements.  (Dkt. No. 110-1 at 10.)  Plaintiff counters that he

claims defendants filed false incident reports, and that throughout the third amended complaint,

plaintiff made clear that defendants lied about their conduct during the March 10, 2008 incident,

ostensibly to cover up their roles in allegedly failing to protect plaintiff.

Allegations that officials engaged in a cover-up state a constitutional claim only if

the cover-up deprived plaintiff of his right of access to courts by causing him to fail to obtain

redress for the constitutional violation that was the subject of the cover-up.  See <u>Karim-Panahi v.</u>

<u>Los Angeles Police Dept.</u>, 839 F.2d 621, 625 (9th Cir. 1988) (cover-up "allegations may state a

1  federally cognizable claim provided that defendants' actions can be causally connected to a

2  failure to succeed in the present lawsuit."); Rose v. City of Los Angeles, 814 F.Supp. 878, 881

3  (C.D. Cal. 1993).  A cover-up claim is premature when, as here, plaintiff's action seeking redress

4  for the underlying constitutional violations remains pending.  See Karim-Panahi, 839 F.2d at 625

5  (claim alleging police cover-up of misconduct was premature when action challenging

6  misconduct was pending); Rose, 814 F.Supp. at 881 ("Because the ultimate resolution of the

7  present suit remains in doubt, [p]laintiff's cover-up claim is not ripe for judicial consideration.")

8          Here, plaintiff brings a claim against defendants for excessive force and an alleged

9  failure to protect plaintiff from Carroll's attack, and contends that defendants falsified their

10  incident reports to allegedly cover up what happened during the incident. If plaintiff succeeds on

11  his claims against defendants, then plaintiff will have suffered no injury caused by defendants.

12  If, however, plaintiff does not succeed on his claims against defendants, then defendants might

13  have successfully impeded plaintiff's right of access to the courts.  Accordingly, the court finds

14  plaintiff's cover-up claim is not ripe until he can show that his underlying suit – his pending

15  Eighth Amendment claims against defendants – fails.  Because plaintiff has not yet suffered harm

16  as a result of the defendants' alleged cover-up, this court recommends that plaintiff's cover-up

17  claim against defendants be dismissed without prejudice.[11]

18  VII.  Qualified Immunity

19          Alternatively, defendants seek qualified immunity on this claim.  Defendants

20  contend that plaintiff has provided no evidence that defendants breached their duty to plaintiff,

21  and that because defendants were responding to mutual combat between four inmates, a

22  reasonable person in defendants' position could have believed their conduct was lawful.

23          A defendant is entitled to qualified immunity if his conduct "does not violate

24

25          [11] However, if a jury determines that defendants are not liable and their version of events
   is essentially true, plaintiff probably will not be able to state a subsequent claim for an alleged
26  cover-up.

1  clearly established statutory or constitutional rights of which a reasonable person would have

2  known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The qualified immunity analysis

3  originally involved a two-step inquiry:  (1) whether the facts alleged or shown by the plaintiff

4  establish a constitutional violation and (2) whether the right at issue was clearly established at the

5  time. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555

6  U.S. 223, 236 (2009).  The Supreme Court has since held that courts have discretion in deciding

7  which prong to address first.  Pearson, 555 U.S. at 236.  "The principles of qualified immunity

8  shield an officer from personal liability when an officer reasonably believes that his or her

9  conduct complies with the law." Id. at 244.  In assessing the validity of an excessive force claim,

10 the court must inquire, "whether force was applied in a good-faith effort to maintain or restore

11 discipline, or maliciously and sadistically to cause harm. McMillian, 503 U.S. at 7.  In resolving

12 these issues, the court must view the evidence in the light most favorable to plaintiff and resolve

13 all material factual disputes in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th

14 Cir. 2003).  Qualified immunity protects "all but the plainly incompetent or those who knowingly

15 violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

16          Here, as set forth above, there remain material factual disputes regarding the

17 extent to which defendants knew of and disregarded an excessive risk of harm to plaintiff's

18 health, and whether the use of force was excessive.  Construing the facts in the light most

19 favorable to plaintiff, Saucier, 533 U.S. at 201, the court must assume that plaintiff was pepper-

20 sprayed while prone on the ground, and that defendant Her left the scene of the incident before

21 all of the involved inmates were under control, and that defendant Solorzano failed to pepper

22 spray inmate Carroll, each defendant consciously choosing to disregard a substantial risk of

23 further or permanent harm to plaintiff, and using excessive force against plaintiff.[12]  So

24

25          [12]  Of course, equally compelling is defendants' argument that defendants were acting
   under exigent circumstances, solely to quell the fight among the four inmates, and to prevent it
26 from escalating among the eight to twelve inmates in close proximity.  The material factual

1   construed, plaintiff's allegations preclude summary judgment on defendants' qualified immunity

2   defense.  See McMillian, 503 U.S. at 6-7 (standard for Eighth Amendment excessive force

3   claim); Robins, 60 F.3d at 1442 (failure to intervene and protect can violate a prisoner's Eighth

4   Amendment rights).

5          At the time of the incident, it was clearly established that "prison officials have a

6   duty . . . to protect prisoners from violence at the hands of other prisoners."  Farmer, 511 U.S. at

7   833.  It was also clearly established that the "unnecessary and wanton infliction of pain"

8   constitutes cruel and unusual punishment prohibited by the United States Constitution.  Whitley,

9   475 U.S. at 319; see also McRorie v. Shimoda, 795 F.2d 780, 784 (9th Cir.1986) (Eighth

10  Amendment violated by an assault while an inmate was not resisting).  Defendants had a clearly

11  established duty to assure plaintiff's safety.  Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

12         Construing the facts in the light most favorable to plaintiff, it would have been

13  clear to a reasonable officer that pepper-spraying a compliant inmate laying prone on the ground

14  constitutes excessive force.  Moreover, taking plaintiff's allegations as true, it would have been

15  clear to a reasonable officer that leaving plaintiff, a black inmate, prone on the ground in close

16  proximity to eight to twelve white inmates, during what appeared to be mutual combat between

17  two black inmates and two white inmates, leaving plaintiff vulnerable to Carroll's attack, was

18  unlawful.  Thus, the court must conclude that defendants potentially acted with deliberate

19  indifference to plaintiff's clearly established Eighth Amendment right to be protected from a

20  substantial risk of serious harm and from excessive force.  This construction is inconsistent with

21  defendants' qualified immunity defense.

22         If an officer recklessly disregards an inmate's need for safety he
           certainly cannot maintain an objective good faith immunity
23         defense.  By the same token, if a prison official fails the objective
           good faith immunity test -- i.e., he is aware of an inmate's need for
24         protection but fails to take adequate safeguards to protect him --

25

26  disputes underlying plaintiff's claims prevent entry of summary judgment or the grant of
    qualified immunity.

> then he has exhibited the sort of 'reckless indifference' sufficient to constitute 'cruel and unusual punishment.'

Miller v. Solem, 728 F.2d 1020, 1025 (8th Cir. 1984) (citations omitted); see also Albers v. Whitley, 743 F.2d 1372, 1376 (9th Cir. 1984) (deliberate indifference and qualified immunity are "mutually exclusive"), rev'd on other grounds, 475 U.S. 312 (1986); Treats v. Morgan, 308 F.3d 868 (8th Cir. 2002) (Treats, pepper-sprayed and thrown to the ground, presented sufficient evidence to show a violation of a clearly established constitutional right, therefore defendants were not entitled to qualified immunity defense).  Thus, defendants' summary judgment motion based on a qualified immunity defense to these claims must be denied.

VIII. Motion to Strike

Defendants move to strike myriad portions of plaintiff's declaration and other evidence relied on by plaintiff in support of his motion.  All parties are allowed to provide declarations setting forth their recollections of the facts, as seen or heard, by that party. Defendants' objections based on a lack of foundation are overruled.  On summary judgment, evidence need not be in a form that is admissible at trial.  See Burch v. Regents of the University of California, 433 F. Supp.2d 1110, 1118-24 (E.D. Cal. 2006).  Accordingly, as long as a party submits evidence, which, regardless of its form, may be admissible at trial, it may be considered on summary judgment.  Burch, at 1120 (citing Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003)).  Defendants' motion to strike is denied without prejudice.

IX.  Conclusion

Accordingly, IT IS HEREBY ORDERED that defendants' June 6, 2011 motion to strike (dkt. no. 121) is denied without prejudice; and

For all of the reasons set forth above, IT IS RECOMMENDED that the April 4, 2011 motion for summary judgment (dkt no. 110) be granted as to plaintiff's due process claim, and denied in all other respects, and plaintiff's false report or cover-up claim be dismissed without prejudice.

1           These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

3    one days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6    objections shall be filed and served within fourteen days after service of the objections.  The

7    parties are advised that failure to file objections within the specified time may waive the right to

8    appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

9    DATED:  January 24, 2012

10

11                               _____

12                              KENDALL J. NEWMAN
                           UNITED STATES MAGISTRATE JUDGE

13   carr0826.msj

14

15

16

17

18

19

20

21

22

23

24

25

26